IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

Crystal Laughman                    :

    Plaintiff                   :

    v.                          : Case No.  3:15-CV-2151

Carolyn W. Colvin                   : (Judge Richard P. Conaboy)
Acting Commissioner of
Social Security                     :

    Defendant                   :

                                :

_____

**Memorandum**

We consider here Plaintiff Crystal Ann Laughman's appeal from
an adverse ruling of the Social Security Administration ("SSA")
dated September 10, 2015.  On that date the Appeals Council denied
Plaintiff's claim and its decision constitutes a final decision by
the SSA.  The Appeals Council's ruling adopted many aspects of an
Administrative Law Judge's opinion dated April 8, 2014, including
the ALJ's pivotal conclusion that the Plaintiff had not been under
a disability from the date of her application through the date the
opinion was filed.  Accordingly, Plaintiff's dual applications for
Disability Insurance Benefits ("DIB") and Supplemental Security
Income Benefits ("SSI") were denied.  The parties have fully
briefed (Docs. 11, 13, and 14) the issues and this matter is ripe
for disposition.

1

## I.    Procedural Background.

Plaintiff initially filed her applications for DIB and SSI benefits on March 7, 2011.  She alleged a disability onset date of April 1, 2005.  After her claims were denied at the administrative level on April 27, 2011 she filed a written request for a hearing on June 3, 2011.  Before the hearing took place Plaintiff amended her alleged onset date to June 29, 2008, one day before her insured status for purposes of DIB elapsed.  (T.49).

Upon receiving an unfavorable result from the ALJ who conducted her hearings dated October 18, 2012, May 31, 2013, and October 25, 2013, Plaintiff appealed to the Appeals Council.  When the Appeals Council, despite its disagreement with some of the ALJ's findings, also issued an unfavorable ruling, Plaintiff filed a timely appeal with this Court on November 10, 2015.  Plaintiff asks this Court to reverse the Commissioner's decision or, in the alternative, to remand this matter for further administrative proceedings.

## II.  Factual Background.

### A.    Testimony Before the ALJ.

Plaintiff Laughman's testimony may be summarized as follows: At the hearing of October 18, 2012 she testified that she was born on September 17, 1963 and was 49 years old on the date of the hearing.  She stated that she is single and resides with her 12 year old son.  She has lived at her current address for 11 years

2

and rents in a public housing complex.  Her rent is $83.00 per month.  Her only income is from court-ordered child support of $73.50 per week.  She also receives food stamps and has a medical card.  She graduated from high school and last worked in April of 2005 as a property manager at ADC Self-Storage.  She left that job because it became too strenuous for her after she had hernia surgery in August of 2004.  (T.37-51).

The hernia surgery did not produce a good result in that wire mesh that was installed to provide abdominal wall support became dislodged.  This caused an uncomfortable sensation that her stomach was sagging.  This sensation would intensify when Plaintiff would walk, bend or cough.  It became too uncomfortable for her to work. This situation lasted for years until she had a subsequent surgical repair in 2012 that involved removing the mesh from the previous operation and securing new wire mesh to support her lower abdomen. Between 2005 and 2012 the effects of Plaintiff's abdominal surgery were so debilitating that she could not work.  At the time of the hearing she stated that she was finally experiencing relief from her abdominal pain.  (T.51-55).

Plaintiff also testified that she was experiencing headaches stemming from a 1984 accident in which her jaw was broken and pushed out of place.  However, her biggest problem was her sagging stomach that she stated had pulled her back out of line causing spasms in her low back.  These spasms happen everyday and are more

3

or less continuous.  Movement of any kind aggravates her back spasms so Plaintiff no longer sweeps, cooks, or bends.  She sometimes uses the oven to bake but only when she has a neighbor available to place things in and take things out of the oven. (T.56-64).

Plaintiff also stated that she took only Tylenol and that it would alleviate her back spasms and abdominal pain for about four hours.  She also attempted to explain, through a long exchange with the ALJ, why she went from 2009 to 2012 without having a subsequent surgery to repair the abdominal hernia.  Essentially, she testified that the various doctors she treated with were unwilling to attempt the type of surgery she required and that it took her three years to identify a surgeon who could help her.  (T.64-71).

Plaintiff stated that she cannot bend down to lift any object. She acknowledged that she was able to lift items as heavy as a half gallon of milk if the items were on a shelf that did not require her to bend in order to grasp them.  She found it necessary to have the people who collect shopping carts help her get her food order from her cart into her vehicle.  (T.71-75).

From 2008 to 2011, Plaintiff had walked her son to school each day, a distance of approximately three blocks.  She testified that after walking her son to school she would run errands, watch tv, prepare dinner, watch him do his homework, and then go to bed at

4

about 9:30 pm.  Her sleep is hampered by an inability to turn from side to side and by pain in her neck region.  (T.76-79).

Plaintiff testified further that she treated with Dr. Zappitelli about once per year.  She also treated with Dr. Lee, a chiropractor, and Kevin Bruck, a chiropractor and "myofascial release therapist".  She stated that, because she needs to change positions every 20 minutes, she breaks her day into alternating 20 minute segments of sitting, standing, walking and reclining.  About three days per week she finds it necessary to lie down for about one hour in the afternoon.  This is typically necessary on damp or particularly cold days.  She also testified that she has difficulty reaching out in front of her with her left arm and cannot reach up over her head with either arm.  The hearing transcript reveals that she did raise both arms and extend them over her head while testifying to those specific limitations for a short period of time.  Plaintiff stated that she cannot keep her arms extended long enough to do such things as blow dry her hair or remove her own shirts.  (T.79-84).  Plaintiff testified that she does not wear clothing with buttons because she lacks the manual dexterity to manipulate the buttons.  She has similar difficulty with zippers. She does not know why her finger strength and dexterity has decreased and stated that she had been tested for carpel tunnel syndrome but that test was negative.  She is currently receiving myofascial massage treatments and these have afforded her some

level of relief from the numbness and loss of strength in her left arm. (T.84-88).

**B.   Hearing of May 31, 2013.**

Plaintiff testified that she had been seeing her primary care physician about three times per year since 2004. She stated: that at no time since 2008 had she been able to lift a gallon of milk; that every day she found it necessary to lie down and elevate her legs from 8-10 times for 20 minutes at a time; that she cannot turn her head to the left or right to look over either shoulder; that she has experienced pain in her neck, left shoulder, and entire outside portion of her left arm since 2008; that she has difficulty dressing herself and getting her shoes on; that she has difficulty grasping or holding anything with her left hand; that she has problems with balance; that she must alternate positions every 20 minutes; and that she quit her last job because the physical demands of the position became too challenging for her. (T.95-107).

Plaintiff also testified regarding persistent headaches that she claims to experience 2-3 times per week. These headaches are characterized by throbbing pain so intense that she must lie down in a dark area for about three hours each time one occurs. She also described her history of abdominal surgeries in 1999, 2001, 2004, 2009 and 2012. She stated that her abdominal pain was better since the 2012 surgery but still existed to a lesser extent.

6

(T.107-116).

Also testifying at the May 31, 2012 hearing was Vocational Expert Andrew Caporelli.  Mr. Caporelli testified that he had reviewed Plaintiff's employment history.  She had worked as a cleaner at Hecht's Department Store from September 1995 to May 1997; as a cookie packer for Staffer's Biscuit Company from 1997 to 1999; as a telemarketer for SGA from 1999 to 2001; as a cafeteria worker for the York School District from 2001 to 2002; as a child care worker at York Daycare Nursery from 2002 to 2003; and with Access Self-Storage as a property manager from 2003 to 2005.  Each of these jobs would be characterized as "sedentary unskilled" or "light semi-skilled" under the SSA's regulations. (T.116-130).

When asked whether, assuming the Plaintiff could perform the full range of sedentary work (except that she could do no frequent lifting or carrying, could lift up to ten pounds only occasionally, would need a sit/stand option, could perform no overhead reaching with her left arm and only occasional overhead reaching with her right arm, could only occasionally crouch, kneel, or stoop, could not use ladders or scaffolds, and could look left, right, up and down only occasionally), Plaintiff could perform any of her past relevant work, the Vocational Expert responded that she could not do any of her former jobs.  (T.116-131).  The VE did opine, however, that given the limitations expressed in the ALJ's aforementioned hypothetical question, other jobs existed in the

national economy that Plaintiff would be capable of performing. These jobs included work as a beverage clerk, a call-out operator, and a semiconductor bonder.  When the ALJ added additional limitations of habitually missing four days of work each month and being able to sit, stand, and walk a total of only four hours each day, the VE stated that the additional limitations would make Plaintiff unemployable.  (T.130-139).

### C.   Hearing of October 25, 2013.

Plaintiff Laughman's testimony on October 25, 2013 may be summarized as follows.  At the time of her hearing she was not working and she stated that she had not worked or looked for work, since her alleged onset date, June 29, 2008.  Thus, as of the date of her hearing, Plaintiff had not worked for approximately 64 months.  (T.151).  Plaintiff stated further that she had begun to experience pain in both knees approximately five weeks before her hearing. The pain was more severe in her left knee than in her right knee and she had been administered cortisone shots to alleviate the pain.  The cortisone shots had provided relief and increased mobility and Plaintiff had been told that the effects of the cortisone shots would last for six months.  (T.152-153).

Plaintiff had recently begun experiencing pain in her right wrist and her doctor had directed her to get a wristband. She did not obtain the wristband because she gets only $73.50 per week. She attributes the pain in her right wrist to "old age".  Plaintiff

testified that she had recently lost four pounds and that she that stood 5'3" and weighted 219 pounds. (T.130-156). Plaintiff stated further that she treats with Dr. Zappitelli and, at the time of her hearing, she had been seeing him about four times per year for 12 years. Dr. Zappitelli had completed two medical source statements concerning the Plaintiff. Dr. Zappitelli solicited Plaintiff's responses to various questions about her physical capacities and range of motion before completing the questionnaires. Plaintiff explained that if she stands too long the backs of her heels will burn; if she sits too long her low back and buttocks go to sleep; and if her neck is in one position too long her left arm, hand, and fingers go numb. (T.156-165).

With respect to her daily activities, Plaintiff stated that she typically gets to sleep by 11:00 pm and wakes up at 3:00am. Between 3:00am and 11:00pm she lays down 2-3 times for about one hour. The rest of her day is spent alternating between sitting, standing, and walking. She typically sits in a plastic lawn chair that has multiple pillows. She periodically rearranges the pillows to adjust her sitting position. Plaintiff usually does not sit in the chair for more than 30 minutes at a time because her feet begin to fall asleep. When she feels her feet beginning to go  numb, she gets up and walks around. She typically alternates 30 minutes sitting and 30 minutes standing. She can sometimes stand up to 45 minutes before her heels begin to hurt by "pushing it". (T.165-

175).

Plaintiff stated that she was in pain during the hearing and the pain was concentrated in her lower back. She stated that this was a result of sitting too long before getting to her feet. Among her numerous physical problems, the one problem that is most responsible for her inability to work is her abdominal problem. Her abdominal pain is constant and she never gets complete relief from it. This abdominal pain started in 1999 when she delivered a child by C-section that required an incision from hip to hip. She stated that she had three surgeries for abdominal hernias in 2001, 2009 and 2012. Since the 2009 surgery her pain has decreased a little but it is still present. The pain is concentrated in her lower abdomen. Since the 2012 surgery, Plaintiff has had difficulty bending to pick up objects. She has difficulty getting into a car and must sit down and then pivot her feet to bring them within the vehicle. She can lower herself by bending her legs but she cannot bend forward from the waist. (T.175-83).

Plaintiff testified further that she is incapable of lifting a gallon of milk out of the refrigerator and carrying it across the room with one hand. She cannot lift a gallon of milk due to pain in her lower abdomen. She drives as far as two miles to shop at a local Walmart. She doesn't drive further because she would be unable to sit that long. She has difficulty turning her head and must rely on her mirrors when she drives. The pain in her neck is

10

alleviated when she uses a U-shaped pillow.  She generally uses the U-shaped pillow whenever she is in a sitting position.  She finds that the U-shaped pillow also seems to alleviate her low back pain. The low back pain, however, is always present to some extent. (T.184-88).  Plaintiff testified further that she has great difficulty dressing herself and must use an orthopedic sock and a shoe horn on an extension to get her shoes on.  Even with the use of these devices, she must be near the steps so that she can place one foot higher than the other to accomplish the task.  She states that, on a scale of 1 to 10, her pain is at a level 3 much of the time.  The pain can be exacerbated by changes in the weather or by remaining in one position too long.  Plaintiff also has trouble with manipulation.  She is incapable of picking up a penney with either hand.  When she is at a store and needs to produce change, she empties the contents of her change purse and has the cashier pick up what is needed to complete her purchase.  She then slides the rest of the change into her purse.  (T.189-93).

Vocational Expert Andrew Caporelli also testified.  In responding to a variety of hypothetical questions asked by both the ALJ and Plaintiff's attorney, Mr. Caporelli testified that: an individual who required rest breaks of 10 minutes every 30 minutes would be unemployable; an individual who had the bilateral use of his hands for only 25 percent of the workday would be unemployable; an individual who can rarely lift 10 pounds, rarely turn his head

left or right, and never twist, stoop, crouch or climb stairs would be unemployable; an individual whose concentration is constantly interrupted by pain would be unemployable; and an individual who could be expected to miss four days of work each month would be unemployable.  On the other hand, the Vocational Expert stated that an individual with the residual functional capacity of light work with the additional limitations of a sit-stand at will option every half hour and only occasional lifting and carrying up to ten pounds would be capable of performing such occupations as a "baker worker conveyor line" and an "information clerk".[1]  (T.189-215).

## II.  Medical Evidence.

### 1.  Dr. Michael J. Zappitelli

Dr. Zappitelli was Plaintiff's primary care physician from January of 2004 through at least April 24, 2013.  (Doc. 35F, at 1030-1034).  Dr. Zappitelli's progress notes with respect to Plaintiff indicate that he saw her on at least 31 occasions in the aforementioned time frame.  (Doc. 11F, 835-873).

Over the years that he treated Plaintiff, Dr. Zappitelli assessed her as suffering from cervical strain with radicular symptoms on six occasions between July of 2006 and June of 2007. By June of 2007, he observed that Plaintiff "continues to be pain

---

[1] The portion of the transcript devoted to the Vocational Expert's testimony is a generally incoherent jumble of sentence fragments and references to exhibits that were not provided to the Court.

free in terms of her musculoskeletal conditions". (Doc. 10F, at 862). However, on September 17, 2007, he noted that Plaintiff presented with continuing neck spasms with "decreased range of motion and daily pain, which she rates from 2-10 to 7-10." (Id. at 861). By March 19, 2008 the muscle spasms in Plaintiff's neck were accompanied by pain radiating down her arms. (Id. at 856). Plaintiff continued to experience neck pain in her cervical spine that was complicated by the onset of low back pain. (Id. at 855). Dr. Zappitelli continued to assess cervical strain and attendant low back pain with decreased range of motion in Plaintiff's cervical, thoracic and lumbar spine until April of 2008. On April 23, 2008, Dr. Zappitelli noted that Plaintiff "is doing much better" but his office note of that date includes a later added notation that Plaintiff called his office on May 5, 2008 complaining of bilateral numbness in her arms. (Id. at 853).

By September 11, 2008, Plaintiff had begun to experience other symptoms including: chest pain, heart palpitations, shortness of breath and bilateral arthralgias. None of these conditions had been previously noted by Dr. Zappitelli. On October 16, 2008, Plaintiff presented to Dr. Zappitelli once again. The office notes of that visit include no mention of the complaints expressed the previous month. However, there is once again mention of cervical strain and sprain and new assessments of lumber degenerative disc disease and left carpel tunnel syndrome. Both these previously

13

mentioned conditions (the lumbar degenerative disc disease and the left carpel tunnel syndrome) had reportedly been diagnosed by an unnamed orthopedist in 2004.  (T.850-52).

Dr. Zappitelli's office notes that postdate October of 2008 and run through March of 2011 do not make further reference to neck, back or arm problems.  Rather, they predominately concern abdominal pain secondary to a ventral hernia, bilateral lower extremity edema (swelling), and anxiety.  Thus, in the roughly two and one half years between October of 2008 and March of 2011 Dr. Zappitelli's progress notes make no mention of problems in Plaintiff's neck, back or arms.  (T.836-853).

On September 25, 2012, Dr. Zappitelli executed a Physical Residual Functional Capacity Questionnaire with respect to Plaintiff Laughman.  This document was created some 18 months after Dr. Zappitelli's last progress notes (T.836) in the record.  Dr. Zappitelli indicated that Plaintiff suffered from scoliosis, ventral hernia, hiatal hernia, chronic back and neck pain, and humerus tumor.  His clinical findings were that Plaintiff had tenderness to palpation in her neck, back, and abdomen along with decreased range of motion and muscle spasm.  He adjudged her to be incapable of even low stress jobs due to her level of chronic pain. He found also that she could neither sit nor stand for more than 30 minutes at a time and that she could not sit nor stand for a total of even four hours during an eight hour workday.  Dr. Zappitelli

also found that every 30 minutes Plaintiff would need to walk for 15 minutes and that any job she would perform would require a sit/stand/walk at will option.  Dr. Zappitelli indicated that Plaintiff would require a 15 minute rest period every 30 minutes during an eight hour workday and that she would need to assume a position in which her legs would be elevated for four hours out of an eight hour workday.  Dr. Zappitelli also stated: that Plaintiff could only rarely lift objects weighing less than 10 pounds and could never lift more than 10 pounds; that Plaintiff could only rarely look up, down, left or right; that Plaintiff could never twist, stoop, crouch, or climb ladders and only rarely climb stairs; that Plaintiff could use her hands for grasping, her fingers for fine manipulation, and her arms for reaching only 10 percent of an eight hour workday.  Dr. Zappitelli indicated that Plaintiff could not be exposed to extreme humidity, dust, fumes, noises and vibrations due to chronic medical conditions.  Finally, Zappitelli estimated that Plaintiff's various medical conditions would result in more than four absences from work each month. (T.984-988).

On April 24, 2013, Dr. Zappitelli completed another Physical Residual Functional Capacity Questionnaire regarding Plaintiff which, while it did indicate that Plaintiff's ability to look down, turn her head left and right, look up, and perform fine manipulations with her fingers had improved slightly, indicated

that Plaintiff continued to remain "incapable of even low-stress jobs". Finally, Dr. Zappitelli stated that Plaintiff's physical impairments could be expected to last at least 12 months. (T.1030-34).

   **2.   Dr. Pramod Digambar.**

   On December 11, 2013, Dr. Pramod Digambar saw Plaintiff for purposes of a consultative examination. Dr. Digambar reported that Plaintiff "...ambulates into the examination room with a normal gait which is not unsteady, lurching or unpredictable. The claimant is able to stand unassisted and able to rise from the seated position and step up and down from the examination table without difficulty or assistive devices. The claimant appeared comfortable both in the seated and supime positions." (Doc. 9-17, Exhibit 41F at 1121). Dr. Digambar also noted that an examination of Plaintiff's cervical spine revealed no tenderness there and that there was no evidence of paravertebral muscle spasm. Plaintiff's dorsal lumbar spine was normally curved and, while Plaintiff had mild tenderness to palpation of the lumbar spinous processes, she had no paravertebral muscle spasm in that area. Dr. Digambar indicated that Plaintiff was able to stand on one leg at a time without difficulty. Plaintiff's legs and arms were symmetrical and demonstrated no evidence of muscle weakness or atrophy. Plaintiff was able to walk on her heels, walk on her toes, and walk heel-to-toe without difficulty. She demonstrated 5/5 strength in her arms

16

and legs bilaterally.  (Id. at 1122).

Dr. Digambar's impressions were: chronic low back pain with radicular symptoms; bilateral knee pain probably due to degenerative joint disease; history of migraine headaches; and obesity.  (Id. at 1123).  Dr. Digambar completed a Medical Source Statement of Ability to do Work-Related Physical Activities on which he noted:  Plaintiff could frequently lift up to ten pounds and occasionally lift 11-50 pounds; Plaintiff could sit and stand for three hours at a time and walk for up to one hour continuously; Plaintiff could sit for up to six hours and stand for up to six hours during an eight-hour workday; Plaintiff could frequently reach overhead, otherwise reach, handle, finger, feel, push and pull with both hands; Plaintiff could frequently operate foot controls with either foot; Plaintiff could occasionally use stairs and ladders, balance, stoop, kneel, crouch, and crawl; and, while Plaintiff could never be exposed to unprotected heights, she could occasionally be exposed to humidity, dust, fumes, extreme cold and heat, vibrations and moderate office noise.  Finally, Dr. Digambar opined that the limitations he noted would not last for 12 consecutive months.  (Id. at 1130-1135).

### 3.  SSA Decision.

The ALJ's decision included the following findings:

(1) The claimant meets the insured status requirements of the Social Security Act through June 30, 2008.

17

(2)  The claimant has not engaged in substantial gainful
     activity since April 1, 2005, the alleged onset date.

(3)  The claimant has the following severe impairment:
     recurrent ventral hernia.

(4)  The claimant does not have an impairment or combination
     of impairments that meets or medically equals the
     severity of one of the listed impairments in 20 CFR Part
     404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525,
     404.1526, 416.920(d), 416.925 and 416.926).

(5)  After careful consideration of the entire record, the
     undersigned finds that the claimant has the residual
     functional capacity to perform light work as defined in
     20 CFR 404.1567(b) and 416.967(b) except the claimant can
     only occasionally stoop.

(6)  The claimant is unable to perform any past relevant work.

(7)  The claimant was born on September 17, 1963 and was 41
     years old, which is defined as a younger individual age
     18-49, on the alleged disability onset date.  The
     claimant subsequently changed age category to closely
     approaching advanced age.

(8)  The claimant has at least a high school education and is
     able to communicate in English.

(9)  Transferability of job skills is not an issue in this
     case because the claimant's past relevant work is

unskilled.

(10) Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform.

(11) The claimant has not been under a disability, as defined in the Social Security Act, from April 1, 2005 through the date of this decision.

(T. at 19-26).

## 2. **Appeals Council Decision.**

The Appeals Council ratified the ALJ's determination that Plaintiff was not disabled and affirmed all of the ALJ's findings but one. The Appeal's Council found at step 2 of the Commissioner's five-step analysis that Plaintiff has multiple severe impairments. Whereas the ALJ had found that Plaintiff's only severe impairment was "recurrent ventral hernia", the Appeal's Council's review of the record persuaded it that Plaintiff has additional severe impairments including lumbar degenerative disc disease, cervical degenerative disc disease, and bilateral knee impairment with pain. In all other respects, the Appeals Council agreed with the ALJ's conclusions, including the ultimate conclusion that Plaintiff "is able to perform a significant number of other light jobs in the national economy". (Doc. 9-2 at 6).

### III. Disability Determination Process.

The Commissioner is required to use a five-step analysis to determine whether a claimant is disabled.[2]  It is necessary for the Commissioner to ascertain: 1) whether the applicant is engaged in a substantial activity; 2) whether the applicant is severely impaired; 3) whether the impairment matches or is equal to the requirements of one of the listed impairments, whereby he qualifies for benefits without further inquiry; 4) whether the claimant can perform his past work; 5) whether the claimant's impairment together with his age, education, and past work experiences preclude him from doing any other sort of work.  20 CFR §§ 404.1520(b)-(g), 416.920(b)-(g); *see Sullivan v. Zebley*, 493 U.S. 521, 110 S. Ct. 885, 888-89 (1990).

The disability determination involves shifting burdens of proof.  The initial burden rests with the claimant to demonstrate

---

[2]  "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less that 12 months . . . ." 42 U.S.C. § 423(d)(1)(A).  The Act further provides that an individual is disabled

> only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. § 423(d)(2)(A).

that he or she is unable to engage in his or her past relevant work.  If the claimant satisfies this burden, then the Commissioner must show that jobs exist in the national economy that a person with the claimant's abilities, age, education, and work experience can perform.  *Mason v. Shalala*, 993 F.2d 1058, 1064 (3d Cir. 1993).

As set out above, the instant decision was decided at the fifth step of the process when the ALJ found there are jobs that exist in the national economy that Plaintiff is able to perform. (R.26).

## IV. Standard of Review

This Court's review of the Commissioner's final decision is limited to determining whether there is substantial evidence to support the Commissioner's decision.  42 U.S.C. § 405(g); *Hartranft v. Apfel*, 181 F.3d 358, 360 (3d Cir. 1999).  Substantial evidence means "more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *see also Cotter v. Harris*, 642 F.2d 700, 704 (3d Cir. 1981).  The Third Circuit Court of Appeals further explained this standard in *Kent v. Schweiker*, 710 F.2d 110 (3d Cir. 1983).

> This oft-cited language is not . . . a talismanic or self-executing formula for adjudication; rather, our decisions make clear that determination of the existence *vel*

21

*non* of substantial evidence is *not* merely a
quantitative exercise.  A single piece of
evidence will not satisfy the substantiality
test if the Secretary ignores, or fails to
resolve, a conflict created by countervailing
evidence.  Nor is evidence substantial if it
is overwhelmed by other evidence--
particularly certain types of evidence (e.g.,
that offered by treating physicians)--or if
it really constitutes not evidence but mere
conclusion.  *See Cotter*, 642 F.2d at 706
("Substantial evidence" can only be
considered as supporting evidence in
relationship to all the other evidence in the
record.") (footnote omitted).  The search for
substantial evidence is thus a qualitative
exercise without which our review of social
security disability cases ceases to be merely
deferential and becomes instead a sham.

710 F.2d at 114.

    This guidance makes clear that it is necessary for the
Secretary to analyze all evidence.  If she has not done so and has
not sufficiently explained the weight given to all probative

exhibits, "to say that [the] decision is supported by substantial evidence approaches an abdication of the court's duty to scrutinize the record as a whole to determine whether the conclusions reached are rational." *Dobrowolsky v. Califano*, 606 F.2d 403, 406 (3d Cir. 1979).   In *Cotter*, the Circuit Court clarified that the ALJ must not only state the evidence considered which supports the result but also indicate what evidence was rejected: "Since it is apparent that the ALJ cannot reject evidence for no reason or the wrong reason, an explanation from the ALJ of the reason why probative evidence has been rejected is required so that a reviewing court can determine whether the reasons for rejection were improper." *Cotter*, 642 F.2d at 706-07.   However, the ALJ need not undertake an exhaustive discussion of all the evidence.   *See*, *e.g.*, *Knepp v. Apfel*, 204 F.3d 78, 83 (3d Cir. 2000).   "There is no requirement that the ALJ discuss in its opinion every tidbit of evidence included in the record."   *Hur v. Barnhart*, 94 F. App'x 130, 133 (3d Cir. 2004).   "[W]here [a reviewing court] can determine that there is substantial evidence supporting the Commissioner's decision, . . . the *Cotter* doctrine is not implicated."   *Hernandez v. Commissioner of Social Security*, 89 Fed. Appx. 771, 774 (3d Cir. 2004) (not precedential).

A reviewing court may not set aside the Commissioner's final decision if it is supported by substantial evidence, even if the court would have reached different factual conclusions.   *Hartranft*,

181 F.3d at 360 (*citing Monsour Medical Center v. Heckler*, 806 F.2d
1185, 1190-91 (3d Cir. 1986); 42 U.S.C. § 405(g) ("[t]he findings
of the Commissioner of Social Security as to any fact, if supported
by substantial evidence, shall be conclusive . . .").  "However,
even if the Secretary's factual findings are supported by
substantial evidence, [a court] may review whether the Secretary,
in making his findings, applied the correct legal standards to the
facts presented."  Friedberg v. Schweiker, 721 F.2d 445, 447 (3d
Cir. 1983) (internal quotation omitted).  Where the ALJ's decision
is explained in sufficient detail to allow meaningful judicial
review and the decision is supported by substantial evidence, a
claimed error may be deemed harmless.  See, e.g., Albury v.
Commissioner of Social Security, 116 F. App'x 328, 330 (3d Cir.
2004) (not precedential) (citing Burnett v. Commissioner, 220 F.3d
112 (3d Cir. 2000) ("[O]ur primary concern has always been the
ability to conduct meaningful judicial review.").  An ALJ's
decision can only be reviewed by a court based on the evidence that
was before the ALJ at the time he or she made his or her decision.
Matthews v. Apfel, 239 F.3d 589, 593 (3d Cir. 2001).

**V.   Discussion.**

    **A. General Considerations**

At the outset of our review of whether the ALJ has met the
substantial evidence standard regarding the matters at issue here,
we note the Third Circuit has repeatedly emphasized the special

nature of proceedings for disability benefits.  See Dobrowolsky,
606 F.2d at 406.  Social Security proceedings are not strictly
adversarial, but rather the Social Security Administration provides
an applicant with assistance to prove his claim.  Id.  "These
proceedings are extremely important to the claimants, who are in
real need in most instances and who claim not charity but that
which is rightfully due as provided for in Chapter 7, Subchapter
II, of the Social Security Act."  Hess v. Secretary of Health,
Education and Welfare, 497 F. 2d 837, 840 (3d Cir. 1974).  As such,
the agency must take extra care in developing an administrative
record and in explicitly weighing all evidence.  Dobrowolsky, 606
F.2d at 406.  Further, the court in Dobrowolsky noted "the cases
demonstrate that, consistent with the legislative purpose, courts
have mandated that leniency be shown in establishing the claimant's
disability, and that the Secretary's responsibility to rebut it be
strictly construed."  Id.

**VI.  Plaintiff's Allegations of Error.**

The Plaintiff assigns six separate errors, three of which
concern the substantiality of the evidence supporting the SSA's
decision.  We shall consider these in turn.

**1.   Whether the Appeals Council Abused its Discretion by Not**
**Remanding the Case for the ALJ's Assessment of the**
**Limiting Effects of all Plaintiff's Severe Impairments?**

Plaintiff contends that, because the Appeals Council found

25

that Plaintiff suffered from three severe impairments (degenerative
lumbar disc disease, degenerative cervical disc disease, and
bilateral knee impairment with pain) that the ALJ did not
recognize, the Appeals Council should have remanded this case to
the ALJ for further consideration of whether the totality of the
limiting effects of these impairments was disabling.  Plaintiff
states, without citation to any authority, that "[T]he Appeals
Council is only there to determine if an ALJ has committed error
and whether the decision is supported as a whole." (Doc. 11 at 18).
Thus, because the Appeals Council denied benefits without remanding
the case for further consideration by the ALJ, Plaintiff asserts
that the Appeals Council abused its discretion.  The Court cannot
agree.

The Code of Federal Regulations sets forth the options the
Appeals Council has when it evaluates a case, specifically:

> After it has reviewed all the evidence in the
> Administrative Law Judge hearing record and any
> additional evidence received,...the Appeals Council
> will make a decision or remand the case to an
> Administrative Law Judge.  The Appeals Council may
> affirm, modify, or reverse the Administrative Law
> Judge hearing/decision or it may adopt, modify or
> reject a recommended decision.  If the Appeals
> Council issues its own decision, it will base its

decision on the preponderance of the evidence.

20 CFR 404.979: See also 20 CFR 404.967 ("the Appeals Council may deny or dismiss the request for review, or it may grant the request and either issue a decision or remand the case to an Administration Law Judge."). Thus, a result such as that in the instant case, where the Appeals Council has adopted and modified a decision by an ALJ, is obviously envisioned by the rules that govern the conduct of Social Security Appeals. Plaintiff's assertion that refusing to remand this case for further consideration by an ALJ is a categorical abuse of discretion is plainly incorrect. Whether the Appeals Council's decision was correct must be determined by reference to the contents of the case file.

   2.   **Whether the ALJ Erred at Step 2 of the SSA's Sequential Evaluation Process by Finding Plaintiff's Migraine Headaches to Be a Non-severe Impairment?**

Both the ALJ and the Appeals Council found that Plaintiff's migraine headaches did not result in more than minimal restrictions and, consequently, classified them as non-severe. The ALJ stated: "...the record shows little evidence that the claimant required any physician intervention for her [migraine] symptoms: that she required any ongoing or regular medications for control of breakthrough symptoms; and demonstrates little evidence of the severity, frequency, or limiting effects of any such impairments." (T. at 22-23). The Court's review of the record persuades it that

the ALJ's decision on this point is supported by the requisite substantial evidence.

Plaintiff's primary physician Dr. Zappitelli made no assessment of migraine headaches on any of his progress notes in the period from January of 2004 through April of 2013. (Doc. 11f at 835-873). The only evidence in the record of migraine headaches is Plaintiff's testimony at her hearing of May 31, 2013. (T.107-116). A claimant's own description of her symptoms is insufficient standing alone, to establish disability. 20 CFR §§ 404.1529(a), 416.929(a). Moreover, it has been held that courts should "...ordinarily defer to an ALJ's credibility determination because he or she has the opportunity at a hearing to assess a witness's demeanor." Reefer v. Barnhart, 326 F3d. 376, 388 (3d. Cir. 2003). Given the virtual absence of any medical documentation of either the existence or severity of Plaintiff's alleged migraine headaches, the ALJ's finding that Plaintiff had not established that claimant's migraine headaches were a severe impairment will not be disturbed.

3. **Whether Substantial Evidence Supports the ALJ's RFC Determination?**

The ALJ concluded that Plaintiff had the residual functional capacity to perform "light work" with the additional limitation that she can stoop only occasionally. Plaintiff asserts: "...that the ALJ's decision is void (sic) of any meaningful discussion about

the evidence relied on to formulate her RFC assessment." (Doc. 11 at 21). Our review of the record convinces the Court that the Plaintiff is correct and that the ALJ's rationale for establishing Plaintiff's RFC determination is not explicitly stated.

Light work, in the context of the Social Security Regulations, is defined as follows:

> Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time.

20 CFR § 416.967(b). The Court will note that Dr. Pramod Digamber, who performed a consultative examination of Plaintiff, executed a

Medical Source Statement that arguably could be used to support the
conclusion that Plaintiff is capable of light work.  However, the
ALJ stated that she was assigning little weight to Dr. Digamber's
conclusions and bemoaned the fact that "...Dr. Digamber based his
assessment upon limitations from impairments not medically
established in the record, suggesting his limitations merely
reflect the claimant's less than credible, subjective reports and
not the presence of any objective or clinically verifiable
criteria."  (T. At 22).

The ALJ's characterization of the testimony of both Dr.
Zappitelli and Dr. Digamber as warranting "little weight" presents
a dilemma.  If the ALJ did not rely on the assessments of either of
these physicians, upon what did she rely?  A thorough review of the
ALJ's opinion discloses that she cites no medical authority for the
proposition that the Plaintiff can do "light work".  Inasmuch as
Dr. Zappitelli has unequivocally indicated that Plaintiff is
incapable of any gainful employment, it is incumbent on the
Commissioner to identify medical evidence substantiating its
finding that Plaintiff can perform light work.  Doak v. Heckler,
790 F.2d 26, 29 (3d Cir. 1986).  This case will be remanded for
consideration of this point.

**4.     Whether Substantial Evidence Supports the ALJ's
         Evaluation of the Opinion of Plaintiff's Treating
         Physician?**

Opinions provided by treating physicians with a longitudinal history of treating a claimant are normally entitled to great weight and even controlling weight when "well-supported by medically acceptable clinical and laboratory diagnostic techniques and not inconsistent with the other substantial evidence in the claimant's case record...."  Fargnoli v. Massanari, Acting Commissioner, 247 F.3d  34, 43 (3d. Cir. 2001).  Here, Dr. Zappitelli, Plaintiff's longtime treating physician, has the requisite longitudinal perspective such that his opinion would ordinarily be entitled to great weight.  However, a close review of his treatment notes (Doc. 10F) reveals no diagnostic testing that was performed at his instance and anecdotal notes over a long period of time suggesting that Plaintiff's physical condition was not as dire as that described in two medical source statements he authored more than two years after he generated his last treatment note in the record before this Court.  Given this lack of objective diagnostic testing and his decision to treat Plaintiff only conservatively over a very long period of time, the ALJ was certainly within her prerogatives to assign Dr. Zappitelli's opinion "little weight".  Plaintiff's assignment of error on this point must be rejected.

5.     **Whether the ALJ's Credibility Determination is Supported by Substantial Evidence.**

The ALJ discounted Plaintiff's claim of neck pain, low back

pain, and bilateral knee pain on the basis that "the record does not demonstrate these impairments as medically determinable." (T. At 21). The Appeals Council disagreed with the ALJ and specifically found that the Plaintiff's "lumbar degenerative disc disease, cervical degenerative disc disease, and bilateral knee impairment with pain are severe impairments". (T. at 6). Then, inexplicably, the Appeals Council affirmed the ALJ's finding that the Plaintiff had the residual functional capacity to perform light work with one additional restriction that she should be required to stoop only occasionally. Given the combined effect of the Plaintiff's numerous ventral hernia repairs, lumbar disc disease, cervical disc disease, and bilateral knee impairment with attendant pain, and given the ALJ's criticisms of the only medical evidence in the record that conceivably supports the proposition that Plaintiff can perform light work (Dr. Digamber's report), the Court is not convinced that the SSA properly evaluated the Plaintiff's complaints of pain.

Plaintiff testified at several hearings that she experiences an intense level of pain and the Commissioner has conceded that the various conditions that plague her could be expected to cause such symptoms. (T. at 24). Her physician's progress notes over a lengthy time seemingly support to some extent her allegations of pain. The ALJ's explanation of why she discounted Plaintiff's complaints regarding the intensity, persistence and limiting

effects of her pain is largely dependent upon her incorrect conclusion that Plaintiff's pain did not stem from medically determinable causes.  (T. at 25).  Accordingly, this case must be remanded for further clarification regarding why claimant's complaints of unrelenting pain were not factored into the Commissioner's assessment of Plaintiff's residual functional capacity.

> **6. Whether the ALJ Erred in Finding that Plaintiff Meets the Criteria for Disability Pursuant to Medical Vocational Rule 201.00(h)?**

Plaintiff's last argument regarding whether she must be deemed disabled pursuant to Medical Vocational Rule 201.00(h) is based solely on the Medical Source Statements provided by her primary care physician.  Because the Court has reservations regarding whether the physician's Medical Source Statements are completely consistent with the general thrust of his progress notes regarding his treatment of the Plaintiff, and because there is other medical evidence in the record that, at least arguably, contradicts the primary care physician's conclusions, the Court cannot agree that the record supports a finding that Plaintiff is disabled pursuant to Medical Vocational Rule 201.00(h).

**VII. Conclusion:**

For the reasons discussed above, this case will be remanded to the Commissioner for further proceedings to: (1) assess what

substantial evidence supports the ALJ's finding concerning Plaintiff's residual functional capacity; and (2) clarify why the Plaintiff's complaints of severe, unrelenting pain were considered less than entirely credible.  An Order consistent with these findings will be filed contemporaneously.

BY THE COURT

S/Richard P. Conaboy
Honorable Richard P. Conaboy
United States District

Dated: June 1, 2016

34